James R. Rogers/SBN 99102
jrogers@jrrlaw.net
LAW OFFICES OF JAMES R. ROGERS
125 S. Highway 101, Suite 101
Solana Beach, CA   92075
Telephone:   858-792-9900
Facsimile:   858-792-9509

Attorneys for Defendant/Counter-Claimant
LEXINGTON INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEXAS FARMERS INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>v.<br><br>LEXINGTON INSURANCE COMPANY and DOES 1 through 10,<br><br>        Defendants.<br>_____<br>LEXINGTON INSURANCE COMPANY,<br><br>        Counter-claimant,<br><br>v.<br><br>TEXAS FARMERS INSURANCE COMPANY,<br><br>        Counter-defendant.<br>_____ | Case No. CV06-08220 DDPAJWx<br>[Hon. Otis D. Wright II]<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT<br><br>Hearing Date:   March 10, 2008<br>Time:                1:30 p.m.<br>Courtroom:      11<br><br><br><br><br><br><br>Pre-Trial Conf:   April 7, 2008<br>Trial:                  May 6, 2008 |

1

**Table of Contents**

Page No.

I. STATEMENT OF FACTS……………………………………………… 5
   *Facts Giving Rise to Dispute*……………………………………….. 6
   *The Subject Action*…………………………………………………. 6
II. SUMMARY OF ARGUMENT……………………………………….. 7
III. TRIGGER OF COVERAGE………………………………………... 8
   *The Deemer Clause*………………………………………………… 8
IV. OTHER RELEVANT POLICY LANGUAGE……………………….. 9
V. THE INTERRELATED WRONGFUL ACTS………………………… 10
VI. EVIDENTIARY BURDEN IN AN INSURANCE
    COVERAGE CASE…………………………………………………. 12
VII. FACTS INHERENT IN THE SETTLEMENT………………………. 12
VIII. CHOICE OF LAW………………………………………………….. 15
IX. CONTRACT INTERPRETATION………………………………….. 16
X. LEGAL STANDARD………………………………………………… 16
XI. RELIEF SOUGHT……………………………………………………. 17

2

_____
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

**Table of Authorities**

**Page No.**

**Cases**

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242, 106 S. Ct. 2505 91 L.Ed.2d 202 (1986)……………………. 17

*A.I.U. Ins. Co. v. Superior Court*
    51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990)…………………. 16

*Bank of the West v. Superior Court*
    2 Cal.4th 1254, 10 Cal.Rptr.2d 545 (1992)………………………………. 16

*California Architectural Building Products, Inc. v.*
*Franciscan Ceramics, Inc.*
    818 F.2d 1466 (9th Cir. 1987), cert. denied,
    484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988)……………………. 17

*Celotex Corp. v. Catrett*
    477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)……………………. 17

*Harper v. Wallingford*
    877 F.2d 728 (9th Cir. 1989)………………………………………………. 17

*In Re: Feature Realty Litigation*
    468 F.2d Supp. 1287 (E.D. Wash. 2006)………………………………… 8, 9

*Hurtado v. Superior Court*
    11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (1974)………………….15

*Klaxon Co. v. Stentor Elac. Mfg. Co.*
    313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)…………………….15

*Offshore Rental Co. v. Continental Oil Co.*
    22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721 (1978)………………….15

*United States v. 1.377 Acres of Land*
    352 F.3d 1259 (9th Cir. 2005)……………………………………………16

___
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

1 **Statutes**

2 California Civil Code
3     Section 1636……………………………………………………………… 16
    Section 1639……………………………………………………………… 16
4     Section 1644…………………………………………………………….. 16

5
Federal Rules of Civil Procedure
6     Rule 56…………………………………………………………………… 16

4

_____
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

Defendant and Counter-Claimant LEXINGTON INSURANCE COMPANY ("LEXINGTON") hereby respectfully submits its memorandum of points and authorities in support of its motion for summary judgment.

# I

# STATEMENT OF FACTS

The subject action involves a dispute over which of three primary policies issued by TEXAS FARMERS INSURANCE COMPANY ("TFI") was triggered by a medical malpractice claim filed by Janice Kupukaa ("Kupukaa claim") on **February 22, 2005** against Kaiser Permanente of Hawaii ("Kaiser"). Two of the three TFI policies had primary limits of $5 million while the third had limits of $1 million. **[Appendix of Exhibits, Exhibit 1 (page 2), Exhibit 2 (page 103) and Exhibit 3 (page 118).]**[1]

LEXINGTON INSURANCE COMPANY ("LEXINGTON") was the re-insurer for Ordway Indemnity Ltd. ("Ordway"), the excess insurer above TFI's third policy with limits of $1 million. **[Exhibits 4 and 5 (pages 132 and 141 respectively).]**

In approximately February 2007, the Kupukaa claim settled for the total sum of $3.3 million. **[Exhibit 6 (page 165).]** The settlement was funded by TFI, Ordway and LEXINGTON. Pursuant to a Funding Agreement between TFI, Ordway and LEXINGTION, TFI paid its $1 million primary limits plus an additional $1.15 million, while Ordway paid $1.15 million that LEXINGTON re-insured (paid Ordway) in the amount of $1.15 million. **[Exhibit 7 (page 179).]** TFI and LEXINGTON reserved their rights to seek reimbursement from each other

---

[1] It should be noted at the outset that although TFI issued the subject policies on a **claims-made form**, it converted the risk it agreed to insure to **occurrence or "wrongful act" type coverage** by endorsements #1 and #2. "The coverage afforded by this policy is intended to be on an occurrence basis, notwithstanding any references to claims-made." [Endorsement #1.] "This Policy applies to claims or suits brought as a result of **Wrongful Acts** . . . which take place during the **Coverage Period** . . . ." [Endorsement #2.] (*See* **Appendix of Exhibits,** pages 4, 5, 105, 106, 120 and 121.

and agreed that the prevailing party be entitled to 10% interest. **[Exhibit 7 (page 180).]**

*Facts Giving Rise to Dispute*

The Kupukaa claim was *initially limited* to the alleged wrongful acts of a Dr. Miller (a Kaiser doctor) who *surgically* treated Ms. Kupukaa's proliferative *diabetic* retinopathy. **[Exhibit 8 (page 182 and 184).]** There is no dispute that this alleged malpractice occurred between November 2001 and January 2002, which *initially triggered* TFI's third policy (2001-2002 policy) *with $1 million in limits*. Thus, TFI set up the Kupukaa claim under this policy.

*However,* after the case was ordered to arbitration Kaiser and TFI agreed to let Ms. Kupukaa amend her claim to include *prior* wrongful acts relating to another Kaiser doctor (Dr. Nester) and certain Kaiser nurses for their alleged negligent management and/or treatment of Ms. Kupukaa's *diabetes* **[Exhibits 9 & 10 at pages 197 through 205.]** during the years *2000*, *2001* and *2002*.[2] **[Exhibits 10, 11 & 12 at pages (203 to 205), (209 to 216) and 218, 219 and (252-254).]** Ms. Kupukaa claimed this contributed to her development of PDR (proliferative diabetic retinopathy)[3] and diabetic nephropathy.[4]

Lexington maintains that once the wrongful acts associated with the negligent management/treatment of Ms. Kupukaa's diabetes were added to her claim it triggered coverage under one of TFI's two prior policies (1999-2000 and 2000-2001 policies) *with $5 million in limits.* TFI disagrees with Lexington's position.

*The Subject Action*

TFI filed its First Amended Complaint before this Honorable Court setting forth three (3) causes of action: 1.) Declaratory Relief; 2.) Equitable Indemnity;

---

[2] Because of the applicable statute of limitations, the claimants' attorney limited his experts' opinions to alleged negligent conduct that occurred during the years 2000, 2001 and 2002. [*See* Exhibits 10, 11 & 12.]
[3] This condition is what necessitated the need for Ms. Kupukaa's eye surgeries. [*See* **Exhibit 14** at pages 266 and 267.]
[4] This is what necessitated Ms. Kupukaa's need for dialysis. [*See* **Exhibit 14** at pages 266 and 267.]

and 3.) Equitable Contribution.  LEXINGTON filed its Answer and Counterclaim against TFI asserting the same causes of action.  Essentially, both parties seek reimbursement of their $1.15 million settlement contribution plus 10% interest.

## II

## SUMMARY OF ARGUMENT

Because the Kupukaa claim evolved into Wrongful Acts occurring over a three year period (2000, 2001 & 2002) the critical issue for resolution of this case is which TFI policy or policies did the claim ultimately trigger for coverage purposes.  Resolution of this issue is rather simple and contained within TFI's definition of **Interrelated Wrongful Acts**.

**Interrelated Wrongful Acts** are "**Wrongful Acts** . . . which are logically or causally connected and have as a common nexus any . . . series of facts, circumstances, situations, events or transactions." **[Exhibit 1 at page 93.]**

TFI alleges, and LEXINGTON **does not** dispute, that the wrongful acts Kupukaa alleged against Kaiser in the underlying action were **Interrelated Wrongful Acts**.  [TFI's Amended Complaint, at page 6, lines 6-10; s*ee* discussion in section V, *infra*.]

Now continuing with TFI's definition of **Interrelated Wrongful Act**, "[a]ny . . . **Interrelated Wrongful Acts** s*hall be deemed to have happened at the time of the first Wrongful Act within those Interrelated Wrongful Acts*."  [Emphasis added.] **[Exhibit 1 at page 93.]**

The first Wrongful Act within those Interrelated Wrongful Acts alleged by Kupukaa was during the calendar year 2000. **[Exhibits 10, 11 & 12 at pages (203 to 205), (209 to 216) and 218, 219 and (252-254).]** The TFI policies in effect at the time had limits of $5 million.  Thus, TFI was obligated to fund the entire settlement.

///

///

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

# III
# TRIGGER OF COVERAGE

"The first step in any coverage analysis is determining what event must occur for potential coverage to commence under the terms of the insurance policy. The operative event implicating coverage is also known as the 'trigger' of coverage. The issue is largely one of timing: what must take place within the policy's effective dates for the potential of coverage to be 'triggered'?" *In re: Feature Realty Litigation* 468 F.2d Supp. 1287, 1294 (E.D. Wash. 2006). It logically follows that "[t]he determination of the trigger of coverage depends on the policy language, rather than the type of injury alleged or the theory of liability pled." *Id.*

### *The "Deemer Clause"*

The fact that TFI settled a single claim involving Wrongful Acts and/or Interrelated Wrongful Acts[5] does not necessarily answer the question of when the Wrongful Acts and/or Interrelated Wrongful Acts should be deemed to have occurred. "It is not uncommon for this type of policy provision to include a further clause also referred to as a 'deemer clause,' providing that a single wrongful act shall be deemed to have taken place on the date of the initial wrongful act. [Citation.] *In re: Feature Realty Litigation, supra*, 468 F.2d Supp. 1287, at 1301 (E.D. Wash. 2006).

TFI's "deemer clause" is actually within its Insuring Agreement section and the definition of certain terms contained therein. Pursuant to endorsements #1 and #2, TFI's Insuring Agreement sections were amended to state that TFI agrees to insure "**Injury** caused by . . . *wrongful acts*, . . . and/or occurrences *which take place during the Coverage Period* . . . ." [Emphasis added.] "**Wrongful Acts** . . . which are logically or causally connected and have as a common nexus any . . .

---

[5] TFI defines **Interrelated Wrongful Acts** to mean "**Wrongful Acts** . . . which are logically or causally connected and have as a common nexus any . . . series of facts, circumstances, situations, events or transactions." [Exhibit 1 at page 93.]

series of facts, circumstances, situations, events or transactions . . . [are defined to mean **Interrelated Wrongful Acts**] . . . [and] [a]ny . . . **Interrelated Wrongful Acts** s*hall be <u>DEEMED</u> to have happened at the time of the <u>first</u> Wrongful Act within those Interrelated Wrongful Acts*." [Emphasis added.] **[Exhibit 1, pages 4, 5 & 93; Exhibit 2, pages 105, 106 & 93; and Exhibit 3, pages 120, 121 & 93.]**

Thus, pursuant to TFI's policy language the Kupukaa claim shall be "deemed" to have occurred at the time of the first alleged wrongful act. The first alleged wrongful act asserted by Kupukaa was during the 2000 calendar year.

## IV

## OTHER RELEVANT POLICY LANGUAGE

TFI, like most insurers, inserted language in its policy in order to prevent claimants or insureds from stacking[6] per-claim limits or successive policy year limits. It did so by proscribing that **Interrelated Wrongful Acts** "shall be deemed one claim" [per-claim limitation][7] that "shall [also] be deemed to have happened at the time of the *<u>first</u>* **Wrongful Act** within those **Interrelated Wrongful Acts** [one-policy limitation]." **[Exhibit 1, pages 66 & 93.]**

TFI cannot hide from the fact that it must abide by its own policy terms and conditions even when it results in expanding the policy limits available to its insureds. According to the plain meaning of TFI's policy, wrongful acts occurring during its policy or coverage period trigger coverage.[8]

---

[6] For example, arguing each alleged wrongful act triggers its own per-claim limit (stacking per-claim limits); or, because the wrongful acts spanned three policy years each policy's per claim limits apply (stacking successive policies).

[7] TFI's Limits of Liability section states that "[t]wo or more **Claims,** including **Claims** asserted in a class action or by multiple plaintiffs, involving: (1) the same **Wrongful Act**, **Occurrence**, . . . or (2) **Interrelated Wrongful Acts**, shall be considered one **Claim** . . ." * * * Two or more **Claims**, including **Claims** asserted in a class action or by multiple plaintiffs, based on or arising from the same facts, *course of events*, **Wrongful Act**, . . . or *Interrelated Wrongful Acts, shall be deemed one Claim . . . ."* [Emphasis (italics) added.] **[Exhibit 1, page 66.]**

[8] In the case of *In re: Feature Realty Litigation, supra,* the court provides judicial guidance on the type of policy TFI "intended" to issue. "The two most common types of liability insurance policies are 'occurrence' policies and 'claims made' policies. A 'claims made' policy is one whereby the carrier agrees to assume liability for any errors, including those made prior to the inception of the policy as long as a claim is made during the policy period. On the other hand, an 'occurrence' policy provides coverage for any acts or omissions that arise during the policy period even though the claim is made after the policy has expired. 'Wrongful act' policies, such as the policy here, are

9

Interpreting TFI's policy as a whole, and more specifically the Insuring Agreement, Definitions and Limits of Liability sections, leads to the inescapable conclusion that **Interrelated Wrongful Acts** are considered a single **Claim** that "shall be deemed to have happened at the time of the *first* **Wrongful Act** within those **Interrelated Wrongful Acts**." **[Exhibit 1, pages 4, 5 & 93; Exhibit 2, pages 105, 106 & 93; and Exhibit 3, pages 120, 121 & 93.]**

Ms. Kupukaa based her claim upon alleged wrongful acts occurring during the years 2000, 2001 and 2002. All of the alleged wrongful acts were based on or arose out of Kaiser's treatment of Ms. Kupukaa's diabetes[9] and ophthalmologic symptoms[10] associated with her diabetic condition. Thus, the subject claim "shall be deemed to have happened . . ." in 2000, "the time of the first **Wrongful Act** within those **Interrelated Wrongful Acts**."

## V

## THE INTERRELATED WRONGFUL ACTS

In a December 5, 2006 letter, TFI admitted the Kupukaa claim involved Interrelated Wrongful Acts and asserted that pursuant to its Limits of Liability section "such 'interrelated wrongful acts' by definition constitute only a single claim under the policy." **[Exhibit 13, pages 261-263.]** TFI quoted its definition of Interrelated Wrongful Act to support its position, but conveniently *omitted* the following language: "Any such **Interrelated Wrongful Acts** shall be deemed to have happened at the time of the first **Wrongful Act** within those **Interrelated Wrongful Acts**." **[Exhibit 13, page 262.]**

---

sometimes viewed as a type of occurrence policy. The Court is however mindful that an insurer's contractual obligations must be judged by the language of the policy itself, and not according to blanket rules of coverage which are not necessarily responsive to the wording of this policy. [Citations.] This is important because customarily, in occurrence policies, the timing of the act or omission causing the damage is largely immaterial to establishing coverage because coverage is ordinarily triggered by the time when the complaining party is actually damaged. This is not the case here." *Id.* at 1295 footnote 2.

[9] These wrongful acts relate to Dr. Nester and the nursing staff at Kaiser.
[10] These wrongful acts relate to Dr. Miller's surgical intervention associated with Ms. Kupukaa's proliferative diabetic retinopathy.

In any event, there is no dispute the Kapukaa claim involved Interrelated Wrongful Acts. [TFI's First Amended Complaint, page 6, lines 6-10.] Defense counsel in the Kupukaa case summarized these Interrelated Wrongful Acts in his Mediation Brief as follows:

> Originally, claimants alleged that Ms. Kupukaa's loss of vision resulted from Dr. Miller's improper evaluation, diagnosis and treatment. * * * However, several months ago, Claimants added a new claim alleging that Kaiser negligently managed Ms. Kupukaa's diabetes ***over the years***, which contributed to the development of PDR and diabetic nephropathy, ***which ultimately led*** to her need for kidney dialysis in 2005.
>
> [Emphasis added.] **[Exhibit 14, pages 266 and 267.]**

There is no dispute that Ms. Kupukaa's diabetes is what triggered her ophthalmologic referral to Dr. Miller. **[Exhibit 14, pages 266 and 267.]** It is also undisputed that the development of PDR[11] is what precipitated Dr. Miller's surgical intervention of Ms. Kupukaa's ophthalmologic symptoms. **[Exhibit 14, pages 266 and 267.]** Plaintiff alleged this progressive course of negligent conduct began in 2000.

These alleged wrongful acts are logically and/or causally connected to the treatment and resulting complications and/or symptoms of Ms. Kupukaa's diabetes. They have a common nexus of facts that involved Kaiser's ongoing medical treatment of Ms. Kupukaa's diabetes beginning in calendar year 2000.

///
///
///

---

[11] Proliferative Diabetic Retinopathy occurs when blood vessels on the retina or optic nerve become blocked, consequently starving the retina of necessary nutrients. This may lead to vitreous hemorrhage, retinal detachment or neovascular glaucoma.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

# VI
# EVIDENTIARY BURDEN IN AN
# INSURANCE COVERAGE CASE

"The existence of coverage and the duty to indemnify depends on the true state of facts surrounding the underlying loss or injury. [Citation.] Usually, such facts are established at trial. [Citation.] However, where the claims have been settled, the insurer's obligation to pay and the determination of coverage must be based upon the *facts inherent in the settlement* and, because this is a summary judgment proceeding, the undisputed facts. [Citation.]" [Emphasis added.] *In re: Feature Realty Litigation, supra*, 468 F.2d Supp. 1287, 1295-96 (E.D. Wash. 2006).

The facts inherent in the Kupukaa settlement are contained within the settlement agreement and relevant portions of the underlying defense and claims files. These documents are admissible pursuant to the parties' discovery responses and are being offered by LEXINGTON to show the facts inherent in the settlement.

Of course, the facts inherent in the settlement must be applied to the relevant policy language to determine the existence of coverage. In the present action there is no dispute that coverage exists, the question is which of the three TFI policies applies to the Kupukaa settlement.

# VII
# FACTS INHERENT IN THE SETTLEMENT

The most direct and persuasive evidence of the facts inherent in the Kupukaa settlement is the Kupukaa Settlement Agreement itself. **[Exhibit 6 (pages 165-177).]** It states that the Kupukaas "demanded arbitration of certain claims . . . (the 'Arbitration'), *seeking to recover monetary damages as a result of claims against defendants related to and arising from care and treatment of Janice Kupukaa by the defendants for her diabetes, eye disease and related conditions*." [Emphasis

added.]  **[Exhibit 6, page 166.]**  The parties entered into the settlement agreement ***"in order to provide for certain payments and full settlement and discharge of all claims which are, or might have been, the subject matter of the Arbitration . . . ."*** [Emphasis added.]  **[Exhibits 6, pages 166-167.]**

The subject settlement agreement settled all of the **Interrelated Wrongful Acts** alleged by the Kupukaas that commenced during the year 2000, when one of TFI's $5 million policies was in force.[12]

TFI settled the Kupukaa claim under a single policy; however, the subject dispute arises because TFI settled the claim within its last or third policy, with the minimum amount of limits (the $1 million 2001-2002 policy).

While the settlement agreement itself provides all the necessary evidence to establish the facts inherent to the settlement, the Kupukaas' and Dr. Miller's mediation briefs provide further inherent guidance.  As set forth in both mediation briefs, the vast majority of the Kupukaas' $2+ million special damages directly arose out of the wrongful acts associated with her diabetes,[13] not her eye surgery. **[Exhibit 12 at pages 218, 219, (252-254) and 258;Exhibit 15 at pages 279 and 300.]**

Interestingly, up to a certain key point in time, defense counsel consistently estimated the "**full value**" of Ms. Kupukaa's claim to be "in the *range of $1-2 million*."[14]  [Emphasis added.]  **[Exhibit 16, at pages 304, 307, 309-311, 313-314, 318-319, 323-324, & 327.]**  When asked what they meant by "full value," defense counsel stated "when we say 'full value' it means a jury verdict against Kaiser with no comparable negligence by plaintiff."  **[Exhibit 16 at page 309.]**

This "full value" estimate of between $1-2 million remained the same through September 1, 2006.  **[Exhibit 16 at pages 304, 307, 309-311, 313-314,**

---

[12]   The two TFI policies with limits of $5 million spanned the period from April 1999 to April 2001.
[13]   Most of Ms. Kupukaa's special damages relate to her diabetes (dialysis treatments, medications, etc.).
[14]   These estimates first appeared in a January 2006 monthly report and remained the same until October 2006.

**318-319, 323-324, & 327.]** Defense counsel's value estimate thereafter jumped to $5-7 million.

As of September 1, 2006, all the depositions of the medical experts had been completed *except one*, the Defendant's nephrology (diabetes) expert, Dr. Ward, whose deposition was taken on September 26, 2006. **[Exhibit 17, at page 329.]** As noted above, the wrongful acts associated with the treatment of Ms. Kupukaa's diabetes were first added to her claim in June 2006.

In their October 2006 update, defense counsel withdrew their $1 to $2 million evaluation. They reasoned "[n]ow that all of the medical experts' depositions are completed, we plan to re-evaluate this case in the very near future. . . ." **[Exhibit 18, at pages 333 & 337.]** Based on the deposition testimony of Dr. Ward, who was Kaiser's nephrology (diabetes) expert, it is easy to understand why defense counsel wanted to "re-evaluate" the case.

During his September 26, 2006 deposition Dr. Ward offered the following opinion in response to the question whether he had "a working definition of standard of care": *"A. You know, standard of care is a little bit like pornography. You know? When you see it, you know it, and when its not there, you know it's not there. It's not – you know, there are standards of care. There are guidelines. There are expectations that are multifarious, but I don't think there is one standard of care."* [Emphasis added.] **[Exhibit 17, at page 331.]**

Amazingly, Dr. Ward's flippant and damaging testimony did not end here. When asked whether he understood that the standard of care is what a reasonably prudent physician would do under the same or similar circumstances he responded, *"I'm not sure that I know what a reasonably prudent physician is. I mean, it suggests that there are unreasonably or imprudent physicians around. There are very few of those."* [Emphasis added.] **[Exhibit 17, at page 331.]**

On November 3, 2006, defense counsel provided their updated evaluation: "[W]e believe that the 'worst case' scenario would be an award in the ***range of $5-7 million***."[15]  [Emphasis added.]  **[Exhibit 19, at pages 339 & 342.]**

Between September 1 and November 6, 2006, defense counsel's "full value" and/or "worse case" evaluation increased from $1-2 million to $5-7 million. The only evidentiary information that materialized during this period was Dr. Ward's deposition, who was testifying in response to the allegations added by Ms. Kupukaa in June 2006 regarding Kaiser's negligent treatment of her diabetes commencing in 2000.

Soon thereafter TFI settled the case for $3.3 million.

Defense counsel's reports of estimated value are significant because they show the facts inherent in the Kupukaa settlement included the alleged negligent treatment of Ms. Kupukaa's diabetes that commenced in 2000.

## VIII

## **CHOICE OF LAW**

Federal courts sitting in diversity must apply the same choice of law rules that local courts would apply. *Klaxon Co. v. Stentor Elac. Mfg. Co.,* 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941).  It is well established that California applies the "governmental interests analysis" in resolving choice of law questions, which is based upon the interests of the litigants in the involved states. *Offshore Rental Co. v. Continental Oil Co.*, 22 Cal. 3d 157, 161, 148 Cal. Rptr. 867, 583 P. 2d 721 (1978). California will apply its own rule of decision unless a party litigant invokes the law of a foreign state. *Hurtado v. Superior Court* 11 Cal. 3d 574, 581, 114 Cal. Rptr. 106, 522 P. 2d 666 (1974).  However, the party advocating the application of a foreign law court must demonstrate that the foreign rule of

---

[15]  Defense counsel's definition of "full value" is synonymous with "worse case," i.e., "it means a jury verdict against Kaiser with no comparable negligence by plaintiff."

decision that furthered the interest of that foreign state and, therefore, that it is an appropriate one for the forum to apply the case before it. *Id*.

## IX
## CONTRACT INTERPRETATION

First, contract or policy interpretation is a question of law. *United States v. 1.377 Acres of Land*, 352 F. 3d 1259, 1264 (9th Cir. 2005). *California Civil Code* section 1636 sets forth the statutory rule for contract interpretation whereby the mutual intention of the parties at the time the contract is formed governs its interpretation. *A.I.U. Ins. Co. v. Superior Court* 51 Cal. 3d 807, 821-22, 274 Cal. Rptr. 820, 799 P. 2d 1253 (1990). The parties' mutual intent must be inferred, if possible, solely from the written provisions of the contract. *California Civil Code* § 1639. In this regard, contracts for policies of insurance are interpreted in their ordinary and popular sense. *California Civil Code* § 1644. Further, the contract or policy must be interpreted "as a whole" to determine the mutual intention of the parties at the time of formation. *Bank of the West v. Superior Court* 2 Cal. 4th 1254, 1265, 10 Cal. Rptr. 2d 538, 833 P. 2d. 545 (1992).

LEXINGTON respectfully submits that interpreting TFI's policy as a whole leads to the inescapable conclusion that one of the $5 million TFI policies in force during the calendar year 2000 was triggered by the Kupukaa claim.

## X
## LEGAL STANDARD

Summary judgment is proper where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56. While the moving party has the burden of demonstrating the absence of a genuine issue of fact, if the moving party satisfies its burden, the party opposing the motion must set forth facts showing that there remains a genuine

issue for trial. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Fed. R. Civ. P.* 56(e).

An opposing party who bears the burden of proof at trial of an essential element to its case must submit sufficient evidence to establish a genuine dispute of fact exists as to the essential elements of its case or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986). Moreover, the mere disagreement whether a genuine issue of material fact exists cannot preclude summary judgment. *See Harper v. Wallingford,* 877 F. 2d 728, 731 (9th Cir. 1989); *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir. 1987), cert. denied, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed. 2d 650 (1988).

## XI

## RELIEF SOUGHT

Based on the foregoing, LEXINGTON respectfully request this honorable Court grant its motion for summary judgment and enter judgment in favor of LEXINGTON as follows:

1. Judgment in favor of LEXINGTON INSURANCE COMPANY and against TEXAS FARMERS INSURANCE COMPANY as to the complaint and counter-claim filed by the respective parties;

2. The Court declare that the Kupukaa claim triggered coverage within one of TEXAS FARMERS INSURANCE COMPANY'S policies in effect during calendar year 2000 with policy limits of $5 million;

3. The Court declare that TEXAS FARMERS INSURANCE COMPANY was contractually obligated to fund the entire $3.3 million settlement with Kupukaa;

4. The Court declare that neither ORDWAY INDEMNITY LIMITED nor LEXINGTON INSURANCE COMPANY had any obligation to fund or contribute toward the $3.3 million Kupukaa settlement;

5. LEXINGTON INSURANCE COMPANY is entitled to be reimbursed by TEXAS FARMERS INSURANCE COMPANY the sum of $1.15 million plus 10% interests per annum from the date the Funding Agreement was signed by TFI (March 21, 2007); and

6. For such other and further relief as the Court deems to be appropriate.

Dated: February 11, 2008        JAMES R. ROGERS

By: *James R. Rogers*
_____
James R. Rogers, Esq.
Attorneys for Defendant
LEXINGTON INSURANCE COMPANY

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT