1  PATRICK M. HOWE, State Bar No. 154669
      phowe@sheastokes.com
2  SHEA STOKES ROBERTS & WAGNER, ALC
   510 MARKET STREET, THIRD FLOOR
3  SAN DIEGO, CALIFORNIA 92101-7025
   TELEPHONE:      (619) 232-4261
4  FACSIMILE:      (619) 232-4840

5

6  Attorney for Plaintiff and Counter-Defendant: Texas Farmers Insurance Company

7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

| 11 | TEXAS FARMERS INSURANCE COMPANY, | CASE NO. CV 06-08220 ODW (AJWx) |
|---|---|---|
| 12 | Plaintiff, | Action Date:    December 27, 2006 |
| 13 | vs. | Hon. Judge:    Otis D. Wright, II |
| 14 | LEXINGTON INSURANCE COMPANY and DOES 1 through 10, | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TEXAS FARMERS INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT |
| 15 | | |
| 16 | Defendants. | |
| 17 | | ACCOMPANYING DOCUMENTS: NOTICE OF MOTION; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW; [PROPOSED] STATEMENT OF DECISION; [PROPOSED] JUDGMENT; REQUEST FOR JUDICIAL NOTICE; APPENDIX OF EXHIBITS |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | LEXINGTON INSURANCE COMPANY, | Dept:    Courtroom 11 |
| 24 | Counter-claimant, | Time:    1:30 p.m.<br>Date:    March 17, 2008 |
| 25 | vs. | Pretrial Conference Date:  4/7/08 |
| 26 | TEXAS FARMERS INSURANCE COMPANY, | Trial Date:  5/6/08 |
| 27 | | |
| 28 | Counter-defendant. | |

# I.

## __INTRODUCTION__

This is a reinsurance case.[1]  The sole issue on this motion is whether defendant/counter-claimant Lexington Insurance Company, a reinsurer, can second-guess the good faith settlement and coverage decisions made by its reinsured in settling a large medical malpractice claim.

Black letter reinsurance law says that Lexington is precluded from doing so. Under the well established "follow the settlements" doctrine, a reinsurer cannot dispute settlement or coverage determinations by its reinsured unless the reinsurer can prove fraud, bad faith, or that the underlying claim was clearly outside the coverage provided by the insurance policy between the reinsured and the underlying policyholder. In fact, as one court has aptly noted:

> If the [reinsured] knew that its settlement decisions could
> be challenged by every reinsurer, there would be little
> incentive to settle with the insured.  The costs and risks of
> litigation avoided by settling with the insured would only
> be revived at the reinsurance stage.  (*Commercial Union*

---

[1]    Reinsurance is different than traditional insurance.  Reinsurance is a "special form of insurance obtained by insurance companies to help spread the burden of indemnification.  A reinsurance company typically contracts with an insurance company to cover a specified portion of the insurance company's obligation to indemnify a policyholder in the event of a valid claim. . . . *The reinsurance contract is not with the insured/policyholder.*  When a valid claim is made, the insurance company pays the first level insured and the reinsurance company pays the insurance company.  The reinsurance company's obligation is to the insurance company, and the insurance company vis-a-vi the reinsurer is thus the insured, or more appropriately the 'reinsured.'"  See *Zenith Insurance Company v. Cozen O'Connor* (2007) 148 Cal.App. 4th 998, 1007, citing *Excess & Cas. Reinsurance Ass'n v. Insurance Com'r Etc.* (9th Cir. 1981) 656 F.2d 491, 492.

1    *Insurance Company v. Seven Provinces Insurance*

2    *Company, Ltd.* (D. Mass. 1998) 9 F.Supp.2d 49, 58.)

3        Here, Lexington is attempting to do precisely what the law says cannot be

4    done.   Its reinsured, Ordway Indemnity, was a Kaiser affiliated captive excess

5    insurer of Kaiser Foundation Health Plan.  Ordway Indemnity and Kaiser's primary

6    level insurer, plaintiff/counter-defendant Texas Farmers Insurance Company,

7    adjusted and settled the subject malpractice claim in a way that was entirely

8    reasonable given the facts and circumstances of the claim and the coverage issues

9    involved.  Lexington monitored the claim from the very beginning, but when the

10    time came to settle the claim years later at mediation, Lexington, for the very first

11    time, raised arguments that its reinsurance certificate would not apply.  In

12    Lexington's view, there would be no reinsurance because there was no coverage

13    under the Ordway Indemnity excess policy for the loss at hand.

14        The court should not condone Lexington's eleventh hour second-guessing of

15    the settlement and coverage decisions reached by its reinsured, nor should the court

16    substitute its judgment for the decisions made by the parties at the ground level in

17    resolving and settling the malpractice claim in a way to protect Kaiser and the

18    Kaiser-affiliated physicians involved.  Under the "follow the settlements" doctrine,

19    those decisions must be left undisturbed.[2]

20

21    _____

22    [2]  Texas Farmers is the plaintiff in this case because of a funding agreement

23    reached by Ordway Indemnity, Lexington and Texas Farmers after the underlying
      malpractice claim was settled for $3.3 million.  Texas Farmers had already paid its

24    $1 million limit of coverage.  But, to prevent Kaiser (i.e., Texas Farmers' insured),
      through its captive insurer, from having to fund the $2.3 million balance of the

25    settlement, Texas Farmers and Lexington agreed to fund the balance, in equal $1.15
      million shares, and litigate the validity of Lexington's position in this case.  Under

26    the funding agreement, the prevailing party is to be reimbursed for its $1.5 million
      payment.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.

## FACTS

**A.     The Kaiser Insurance Structure**

The underlying insureds in this case were Kaiser Foundation Health Plan and various of its affiliated entities in Hawaii ("Kaiser").  To protect itself against malpractice claims, Kaiser maintained both primary and excess layers of professional liability insurance.

During the one year period between April 9, 2001 and April 9, 2002, Kaiser placed its first $10 million of coverage through Texas Farmers and Ordway Indemnity.  (Fact 2, 3, 7.)[3]  Texas Farmers was on the risk for the first $1 million per claim, and was the insurer obligated to spend dollar one on the defense of covered claims.  (Fact 2, 3, 4.)  Ordway Limited, which was a Kaiser captive insurer, was on the risk for the next $9 million per claim.  (Fact 7.)

Under the Ordway Indemnity excess policy, Ordway agreed to provide coverage to Kaiser for "ultimate net loss" on a claim in excess of $1 million, whether the loss was insured by Texas Farmers, another carrier, or was self-insured by Kaiser itself.  Indeed, Condition M of the Ordway policy stated:

> VII.   CONDITIONS
>
> M.  Maintenance of "Underlying Amounts"
>
> The Company shall be obligated to indemnify the insured
>
> only for "ultimate net loss" in excess of the "underlying
>
> amounts," whether the Named Insured self-insures or
>
> obtains insurance for such "underlying amounts." . . .

---

[3]  "Fact" refers to the referenced fact in Texas Farmers' accompanying statement of uncontroverted facts and conclusions of law.

1      The Insureds ***shall*** have the right to self-insure the ***full***

2      "underlying amounts."

3      (Fact 7, emphasis added.)

4      The only requirement for coverage was that an "occurrence," i.e., a wrongful

5 act or omission, take place during the policy period.  (Fact 7 .)

6 **B.    Ordway Indemnity's Reinsurance With Lexington**

7      Ordway Limited did not want to take on all of the $9 million of risk excess of

8 the Texas Farmers coverage, so it passed off the first $4 million of the excess to

9 Lexington by way of reinsurance.  For a premium of $3 million, Lexington agreed to

10 reinsure Ordway at "100% of Participation" on a "following form" basis.  (Fact 8.)

11 Specifically, under the reinsurance certificate, Lexington promised:

12      The liability of the Reinsurer shall ***follow*** the terms and

13      conditions off the Company's policy furnished to the

14      Reinsurer at the effective date of the Reinsurance

15      Certificate unless otherwise specifically provided herein

16      by endorsement made a part of this Certificate.

17      …

18      c.  Upon receipt by Reinsurer of satisfactory evidence of

19      payment of a loss for which reinsurance is provided

20      hereunder, Reinsurer ***shall*** promptly reimburse the

21      Company for its share of the loss and loss expenses,

22      subject to paragraph 4 of these General Conditions.

23      (Fact 8, emphasis added.)

24 **C.    The Kupukaa Claim is Made**

25      The underlying malpractice claim was made in 2003.  Janis Kupukaa and her

26 husband, Joseph Kupukaa, claimed that Kaiser physician Stephen Miller negligently

27 performed two surgeries on Janis Kupukaa in July and November 2001, and that, as

28 a result, Ms. Kupukaa was blind.  (Fact 10.)

1    Kaiser tendered the defense of the Kupukaa claim to Texas Farmers.  (Fact

2    11.)  Texas Farmers agreed to defend, and did so through attorney William Hunt of

3    Honolulu law firm of Alston, Hunt, Floyd & Ing.  (Fact 11.)

4    In December 2004, as the Kupukaa claim was making its way through

5    Hawaii's administrative process for med-mal claims, Kaiser's risk management

6    department reported the loss to both Ordway Limited and Lexington.  (Fact 12.)

7    Lexington acknowledged the report on January 26, 2005 and opened a file for the

8    claim.  (Fact 13.)

9    **D.    The Kupukaa Claim Enters the Binding Arbitration Process; the**

10        **Anticipated Exposure Reaches the Ordway Limited Attachment Level**

11    After the administrative process was completed, the Kupukaas filed a

12    complaint in Hawaii state court in February 2005.  (Fact 14.)  The complaint named

13    Dr. Miller and various Kaiser affiliated entities, and alleged that Ms. Kupukaa

14    underwent two negligently performed eye surgeries on July 9 and November 6,

15    2001 that rendered her blind in both eyes.  (Fact 14.)  The lawsuit was thereafter

16    moved to binding arbitration.

17    Lexington continued to monitor the claim and, as of November 2005, even

18    placed a reserve in the event the exposure to Kaiser was over the $1 million limits of

19    coverage on the Texas Farmers policy.  (Fact 15, 16.)

20    By January 2006, attorney Hunt sent a status report to Kaiser, Texas Farmers

21    and Lexington confirming that the value of the case might impact the Ordway

22    excess level policy.  In his report, attorney Hunt stated:

23        Although damages are difficult to predict, we estimate the

24        "full value" of the case to be in the range of $1-2 million

25        and the settlement value in the $400,000-$600,000 range.

26        Given that we now have a liability expert to support Dr.

27        Miller's care, we estimate the chance of a defense verdict

28

-5-

1  as 50-60%, particularly given the issues surrounding

2  causation.

3  (Fact 17.)

4  Given that the Kupukaa claim now posed a risk of triggering a reinsurance

5  obligation, Lexington performed an initial coverage analysis and concluded that

6  coverage for the loss was in place.  (Fact 18, 19.)

7  **E.**  **The Kupukaas Allege a New Kidney-Related Claim; the Claim is**

8  **Consolidated into the Pending Arbitration at the Recommendation of**

9  **Defense Counsel and Approval of Kaiser and its Insurers, and with the**

10  **Full Knowledge of Lexington**

11  On May 12, 2006, the attorneys for the Kupukaas sent a letter to attorney

12  Hunt advising that they were alleging a new claim for diabetes-related damage to

13  Ms. Kupukaa's kidneys because of the negligent care of her primary care physician,

14  Dr. Nestor.  (Fact 21.)  With the arbitration hearing set for only three months away

15  in August, the attorneys did not want to submit the claim through the administrative

16  process, so they approached the defense team about agreeing to consolidate the new

17  claim with the already pending eye-related claim.  (Fact 21.)

18  Attorney Hunt weighed the pros and cons of doing so, and ultimately

19  recommended that Kaiser and its insurers agree to the proposal, so long as certain

20  conditions were met.  Attorney Hunt advised:

21  After consideration, we recommend that we agree to allow

22  them to include this claim in the presently pending

23  arbitration for the following reasons, if we also obtain

24  their agreement not to name Dr. Nestor individually, that

25  we maintain any statute of limitations claims Kaiser would

26  have if they filed a new claim, that we postpone Dr.

27  Nestor's deposition until we've had a chance to meet with

28

him, and extend the deadline for us to identify expert witnesses. The reasons to agree to their request include:

1.    Our defense to the blindness claim is that she had uncontrolled diabetes which caused it, and much of the evidence concerning her care and treatment, and her lack of cooperation in that regard, will be part of the case anyway;

2.    I think the arbitration panel we have in place is a good one, unlikely to be matched later on;

3.    This would force the plaintiffs to attempt to prepare their claim on short notice, without the ability to redepose any Kaiser witnesses (of course, it also requires us to be prepared to defend the case on short notice);

4.    Allowing them to make this claim now will allow us to fully explore her contributory negligence at the arbitration on not only missing eye exams but other care also;

5.    If we force them to file another claim, much of the evidence will be duplicated by this arbitration, and it is possible that whoever wins this arbitration could claim that liability has already been established or not, and the second case becomes moot, based upon this decision (collateral estoppel could apply);

6.    We suspected this could occur and already have experts in place and can be prepared to defend this claim in this arbitration;

7.    While this would increase the potential verdict value, that additional exposure would occur anyway if they file a second claim;

8.    We would avoid another fight on the enforceability on the arbitration clause, although that is not a big concern.

Of course, there are some risks in agreeing to their proposal, which include:

1.    Not being fully prepared at the arbitration, especially if we are unable to obtain Dr. Nestor's firm cooperation;

2.    The size of the award and settlement value of the claim will have to be re-evaluated and will increase;

3.    The plaintiff's may be bluffing and may not decide to spend the time and resources to file a new claim on this issue, but that seems doubtful;

4.    We will now have to retain the additional experts and the cost to defend the case will also be increased.

1         Please contact me to discuss this further once you've had

2         an opportunity to review the above.  We should respond to

3         them sometime this week.

4         (Fact 22.)

5      Kaiser and Texas Farmers each told attorney Hunt that they agreed with and

6 approved of his recommendation.  (Fact 23.)

7      As of May 19, 2006, Lexington was also aware of Hunt's recommendations

8 and the approvals by Kaiser and Texas Farmers.  (Fact 24, 25, 26, 27.)  Lexington,

9 however, voiced no opinion on the consolidation of the kidney-related and eye-

10 related claims into a single arbitration proceeding.  (Fact 28, 48.)  In fact, Lexington

11 continued to remain silent on the issue for the next six months, even after the August

12 arbitration hearing was continued to January 2007.  (Fact 28, 48.)

13 **F.**    **Six Months Later, as the Defense Team Prepares for Mediation,**

14       **Lexington Raises Coverage Issues For the First Time Based on the**

15       **Presence of the Kidney-Related Claim**

16      In November 2006, after numerous depositions and receiving adverse rulings

17 on motions for summary judgment, attorney Hunt updated Kaiser, Texas Farmers

18 and Lexington about the increased exposure to Kaiser and, in particular, to Dr.

19 Miller.  Attorney Hunt advised that the defense standard of care expert on the eye

20 surgeries had performed horribly at deposition and that, while the arbitration panel

21 had dismissed the punitive damages claim against Kaiser, Dr. Miller still faced

22 punitive damages exposure.  (Fact 29, 30.)  Attorney Hunt also advised that, while

23 the chance of a complete defense verdict on the kidney claim was high (70-75%)

24 given the non-compliance history of Ms. Kupukaa, the same was not true for the

25 eye-related claim.  (Fact 29.)  Mr. Hunt put the chance of success at only 30-35%,

26 and estimated a worst case scenario of $5 million to $7 million.  (Fact 29.)  Attorney

27 Hunt also stressed that his evaluation did not even account for the added settlement

28 value of the punitive damages risk to Dr. Miller:

1        Our evaluation does not take into consideration whether a

2        settlement at a larger amount ought to be considered in

3        order to protect Dr. Miller from even the possibility of a

4        punitive damage award.

5        (Fact 29.)

6          Shortly after attorney Hunt's report was sent out, a mediation session was

7    scheduled for December 1, 2006.  In anticipation of the event, Texas Farmers

8    confirmed that its full $1 million of coverage was available, and Dr. Miller provided

9    his written consent to Kaiser and Texas Farmers to settle the case to protect his

10   interests.  (Fact 32, 33.)  In fact, soon thereafter, Dr. Miller's attorney demanded that

11   Kaiser settle the case.  (Fact 36.)

12         With the exposure to Kaiser and Dr. Miller now clearly beyond the

13   attachment level for reinsurance, Lexington management began looking at ways to

14   avoid responsibility altogether.  Brad Reager at AIG sent a memo to the lead

15   adjuster advising that, given the presence of both the kidney-related and eye-related

16   claims, there were two ***distinct*** claims that triggered different coverage obligations.

17   (Fact 31.)  The adjuster was instructed that Lexington "should get a coverage

18   opinion and may need to involve the insured's prior carriers."  (Fact 31.)  The

19   adjuster did so, and, despite Lexington's knowledge of the addition of the kidney-

20   related claim to the mix ***six months earlier***,  noted in his file that "[o]ur coverage

21   concerns pertain to the surfacing of a second claim (treatment of the diabetic

22   condition)."  (Fact 34.)

23         Lexington then threw a wrench into the settlement process.  On November 21,

24   2006, Lexington called Kaiser and advised that it would not participate in any

25   mediation because, in its view, reinsurance was unavailable because of the kidney-

26   related claim that "***recently*** arose."  (Fact 35, emphasis added.)   Lexington also had

27   its coverage counsel distribute a letter setting forth Lexington's position that the

28   "***recent*** amendment" to the arbitration proceeding of the kidney-related claim

1    eliminated coverage under the reinsured Ordway Indemnity excess policy:

2                    Lexington, based upon the ***recent*** amendment of the claim

3                    to include allegations of negligent treatment of Ms.

4                    Kupukaa's diabetes and discovery which identifies 1992 to

5                    2001 as the period when the negligent treatment occurred,

6                    gives notice that there is no coverage under the primary

7                    policy, excess policy or the reinsurance certificate for

8                    injuries or damages arising out of occurrences taking place

9                    prior to the inception date of Texas Farmers Insurance

10                   Company Policy No. 1180-0002 and Lexington's

11                   Facultative Reinsurance Certificate #2004774.

12                   (Fact 37, emphasis added.)

13          Kaiser and its captive insurer, Ordway, immediately objected to Lexington's

14    eleventh hour coverage position, and responded that they would not be putting any

15    prior insurers on notice.  (Fact 38.)

16    **G.        The Kupukaa Arbitration Proceeding Settles After Two Mediations**

17          The first mediation then took place on December 1, 2006.  (Fact 39.)  The

18    case did not resolve, and a second session was set for December 11.  (Fact 39, 43.)

19          Given this, and in light of the coverage position taken by Lexington, the

20    attorney for Dr. Miller immediately sent a letter to Texas Farmers and coverage

21    counsel for Lexington ***demanding*** that the case be settled.  The attorney noted that,

22    despite Lexington's position on the kidney-related claim, there was no question but

23    that coverage applied to the eye-related claim:

24                   I understand that there is some controversy as to the

25                   primary insurance, excess insurance, and/or reinsurance

26                   that would respond to allegations of negligent treatment of

27                   Mrs. Kupukaa's diabetes and accompanying kidney

28                   failure.  However, there is no such controversy with

respect to insurance that should respond to the claims
arising out of treatment rendered by Dr. Miller.  It is our
understanding that the primary coverage that is responding
to those claims is currently being managed by LitNeutral
and that the excess coverage and/or reinsurance for that
coverage is the responsibility of Mr. Bordner's clients.

On behalf of Dr. Miller, ***demand is hereby made*** that your
principals take ***whatever action is necessary*** to prepare for
the upcoming mediation, ***participate meaningfully*** in that
mediation, ***settle all claims*** allegedly arising out of Dr.
Miller's care, and ***effect a complete release*** of any and all
claims that claimants have against Dr. Miller.

(Fact 40, emphasis added.)

Lexington, however, refused to cooperate.  As of December 8, 2006, it
continued to take the position it was not prepared "to contribute anything towards
the settlement at this time in light of the outstanding coverage issues," and that if
Ordway Indemnity and Kaiser settled the Kupukaa matter anyway, "their actions
may very well be [in] conflict with the Conditions contained in our [reinsurance
certificate]."  (Fact 41.)

On December 11, 2006, just hours before the second mediation, Kaiser and
Ordway Indemnity, through Kaiser's head of corporate risk management, tried once
again to address the problems posed by Lexington's last minute coverage tactic.  He
made clear that, from the reinsured's point of view, settling the Kupukaa matter at a
reasonable number would ***not*** be a bar to reinsurance benefits.   (Fact 42.)

Fortunately, the case did settle at the second mediation.  The amount agreed
to by Kaiser and approved by Texas Farmers and Ordway Indemnity was $3.3
million.  (Fact 43.)  In deciding to settle at that number, Kaiser considered many

factors:  Kaiser's and Dr. Miller's liability position on the eye-related portion of the arbitration proceeding was unfavorable; the defense eye surgery expert, Dr. Weingist, did not perform well at his deposition; notwithstanding comparative fault possibilities, it was an undisputed fact that Janis Kupukaa was not blind before she underwent the two surgeries performed by Dr. Miller; given that Ms. Kupukaa had no blindness problems before the two surgeries, there was a significant risk that the arbitration panel would award her a large general damages award; Dr. Miller was a respected senior member of Kaiser's Medical Board; Dr. Miller was the only party in the arbitration proceeding subject to a punitive damages claim; and Dr. Miller's counsel had demanded that Kaiser settle the Kupukaa claim to protect Dr. Miller. (Fact 44.)  All of this was consistent with attorney Hunt's opinion that Kaiser's liability position on the eye-related claim was substantially weaker than was its liability position on the kidney-related claim.  (Fact 45.)

**H.    An Agreement on Funding is Reached**

In 2007, after the settlement of the Kupukaa matter, an agreement was reached to protect Kaiser and its captive insurer from the obligation to pay the $2.3 million balance of the settlement above the $1 million already paid by Texas Farmers.  Texas Farmers, Ordway Indemnity and Lexington entered into a Settlement Funding Agreement pursuant to which:

1.    Texas Farmers and Lexington agreed to pay, in equal shares, the $2.3 million balance of the Kupukaa settlement (i.e., $1.15 million each);

2.    Texas Farmers and Lexington agreed to resolve their disputes as to who was responsible for the $2.3 million difference by way of the present litigation; and

1      3.      Texas Farmers and Lexington agreed to reimburse

2      the other depending on the outcome of the present

3      litigation, plus interest at the legal rate of 10%.

4                                    **III.**

5                              **ARGUMENT**

6      Under F.R.C.P. 56, a party may, at any time, move for summary judgment as

7   to "all or any part thereof" of a complaint or counter-claim.  Where "the pleadings,

8   discovery, and disclosure materials on file, and any affidavits show that there is no

9   genuine issue as to any material fact . . . ," the moving party is entitled to judgment

10  as a matter of law.  F.R.C.P. 56.

11      Here, as shown below, it is undisputed that the settlement reached in the

12  Kupukaa claim was reasonable and that Lexington's reinsured, Ordway Indemnity,

13  at all times acted in good faith in resolving the Kupukaa claim in a way to protect

14  the interests of Kaiser and Dr. Miller.  Lexington, therefore, must "follow the

15  settlement" reached by its reinsured unless it can show Ordway Indemnity was

16  fraudulent, that it acted in bad faith, or that the Kupukaa settlement payment was

17  clearly beyond the scope of coverage of the Ordway Indemnity policy.  Lexington

18  will never be able to meet that burden.

19  **A.**      **As a Reinsurer, Lexington is Bound by Settlements and Coverage**

20           **Decisions Reached by Its Reinsured**

21      The reinsurer/reinsured relationship is unique in the insurance industry.

22  Whereas in the insurer/policyholder relationship an insurer has the contractual right

23  to settle or not settle a given claim and require proof of actual coverage, the same is

24  not true for a reinsurer.  Rather, a reinsurer must "follow the settlements" made by

25  its reinsured.

26      Indeed, the "follow the settlements" doctrine "binds a reinsurer to accept the

27  [reinsured's] good faith decisions on ***all things*** concerning the underlying insurance

28  terms and claims against the underlying insured:  coverage, tactics, lawsuits,

-14-                        CV 06-08220 ODW (AJWx)

1    compromise, resistance, or capitulation." *British Int'l Ins. Co. v. Seguros La*

2    *Republica, S.A.* (2nd Cir. 2003) 342 F.3d 78-85; *The North River Insurance*

3    *Company v. Ace American Reinsurance Company* (2nd Cir. 2004) 361 F.3d 134,

4    139-140.  This "doctrine insulates a reinsured's liability determinations from

5    challenge by a reinsurer unless they are fraudulent, in bad faith, or the payments are

6    'clearly beyond the scope of the original policy' or 'in excess of [the reinsurer's]

7    agreed-to exposure.'"  *North River,* 361 F.3d at 140; *Christiania Gen. Ins. Corp. v.*

8    *Great Am. Ins. Co.* (2nd Cir. 1992) 979 F.2d 268, 280.  In other words, the doctrine

9    "burdens the reinsurer with those risks which the direct insurer bears under the

10    direct insurer's policy covering the original insured."  *Bellafonte Reins. Co. v. Aetna*

11    *Cas. & Sur. Co.* (2nd Cir. 1990) 903 F.2d 910, 912.

12         Simply put, under the "follow the settlements" doctrine, unless the reinsurer

13    can prove fraud or bad faith by the reinsured, it cannot contest any settlements

14    reached by the reinsured, nor can it "dispute good faith determinations that a risk

15    was covered by the underlying insurance policy . . . or good faith interpretations of

16    policy terms."  *North River,*  361 F.3d at 140; *Commercial Union Insurance*

17    *Company v. Seven Provinces Insurance Company, Limited* (D. Mass. 1998) 9

18    F.Supp.2d 49, 57.

19         The primary rationale for the "follow the settlements" doctrine is clear: it is to

20    prevent second guessing by the reinsurer and the courts, through de novo review of

21    the reinsured's decision-making process, from undermining "the foundation of the

22    [reinsured]/reinsurer relationship."  *North River,* 361 F.3d at 140-141.  The

23    *Commercial Union* court perhaps said it best:

24              The purpose of the "follow the settlements" doctrine is to

25              prevent the reinsurer from second-guessing the good faith

26              settlement decisions of the ceding company.  [Citation

27              omitted.]  If the ceding company knew that its settlement

28              decisions can be challenged by every reinsurer, there

would be little incentive to settle with the insured.  The
costs and risks of litigation avoided by settling with the
insured would only be revived at the reinsurance stage.
"The goals of maximum coverage and settlement that have
been long established would give way to a proliferation of
litigation."  (*Commercial Union, supra*, 9 F.Supp.2d at 57-
58.)

**B.**     **The Lexington Reinsurance Certificate Contains an Express "Follow the Settlements" Clause**

Lexington's obligation to "follow the settlements" of Ordway Indemnity is not only implied by law, but is also expressly stated in Lexington's certificate of reinsurance.  Specifically, the certificate states:

> 1.  LIABILITY OF REINSURER AND RETENTION.
> The liability of the Reinsurer shall ***follow the terms and conditions*** off the Company's policy furnished to the Reinsurer at the effective date of the Reinsurance Certificate unless otherwise specifically provided herein by endorsement made a part of this Certificate.
> …
>
> 2.  CLAIMS
> …
> c.  Upon receipt by Reinsurer of satisfactory evidence of payment of a loss for which reinsurance is provided hereunder, Reinsurer ***shall*** promptly reimburse the Company for its share of the loss and loss expenses, subject to paragraph 4 of these General Conditions.

/ / /

-16-

CV 06-08220 ODW (AJWx)

1       This is the exact same Lexington certificate form that was at issue in *City of*
2    *Renton v. Lexington Insurance Company,* 2007 U.S. Dist. LEXIS 69959
3    (W.D.Wash. 2007) 2007 U.S. Dist. Lexis 69959, where the court held that the
4    provisions constituted "follow the settlements" terms for purposes of the reinsurance
5    obligation.[4]  See also *Christiania*, 979 F.2d at 280 ["follow the settlements" doctrine
6    applied where reinsurance certificate stated that "reinsurance provided under this
7    certificate shall follow coverage of [reinsured's] policy."].

8    **C.      Ordway Indemnity's Settlement of the Kupukaa Arbitration Proceeding**
9    **Was Reasonable and in Good Faith; Lexington Cannot Prove to the**
10   **Contrary**

11      Under these rules, the decision made by Lexington's reinsured, Ordway
12   Indemnity, to resolve the Kupukaa arbitration proceeding cannot be second-guessed;
13   Lexington is bound by the settlement.

14      It is undisputed that Ordway Indemnity, as well as the primary insurer (Texas
15   Farmers) and the actual insureds (Kaiser and Dr. Miller) acted reasonably in settling
16   the Kupukaa arbitration proceeding for $3.3 million.  Underlying defense counsel,
17   attorney Hunt, believed and advised his client, Kaiser, that an adverse liability
18   finding on the eye-related claim was very likely.  For its part, Kaiser, through its risk
19   management department, was very concerned that a large general damages award
20   would flow from the blindness condition of Ms. Kupukaa after the two 2001
21   surgeries with Dr. Miller.  As Louise Samuel, the person in charge at Kaiser notes,
22   even considering the evidence which tended to show that Ms. Kupukaa was non-
23   compliant regarding her diabetes condition, it was undisputed that she was not blind
24   before she submitted to the two surgeries and was blind after they were completed.
25   (See Samuel Dec., Exh. VV, p. 291, ¶ 14.)  Furthermore, there was extreme pressure
26   _____
27   [4]    A copy of this published opinion is attached as Exhibit TT to Texas Farmers'
28

1  on Kaiser to settle the case notwithstanding the merits.  Dr. Miller was the only

2  party in the case subject to a punitive damages claim, and his counsel demanded on

3  two occasions that Kaiser and the insurers settle the case to protect Dr. Miller's

4  interests.  Protecting Dr. Miller was of particular concern because he was a highly

5  respected physician on Kaiser's medical board in Hawaii.

6          Nor can there be any dispute but that the Kupukaa settlement was within the

7  coverage of the Ordway Indemnity excess liability policy.  The policy provided that

8  Kaiser was insured against "ultimate net loss" in excess of $1 million for

9  "occurrences" taking place during the policy period.  (Fact 7.)  The policy defined

10 "occurrence" as, with respect to professional liability claims, any "act, error, or

11 omission which results in injury in the furnishing of or the failure to furnish"

12 professional health care services.  (Fact 7.)   Here, it is undisputed that wrongful

13 acts, namely the eye surgeries, took place during the period of coverage under the

14 Ordway Indemnity excess policy between April 9, 2001 and April 9, 2002.

15 **D.**      **Lexington's Anticipated Arguments Regarding Coverage Under the**

16          **Texas Farmers Insurance Policy Are Irrelevant**

17         Lexington will not be able to dispute that coverage existed under the policy of

18 its reinsured, Ordway Indemnity.  Rather, Lexington will attempt to focus the court's

19 attention on whether coverage existed under the primary liability policy maintained

20 by Kaiser with Texas Farmers.  Specifically, Lexington will argue that the

21 "interrelated wrongful acts" language in the Texas Farmers policy mandates that

22 coverage only existed under the earlier Texas Farmers policies in force between

23 April 9, 1999 through April 9, 2001, where the Texas Farmers limits of liability

24 were $5 million and where there was no reinsurance certificate in place by

25 Lexington.  Under the "interrelated wrongful acts language," the Texas Farmers

26

27 Appendix of Exhibits.

28

-18-                                                  CV 06-08220 ODW (AJWx)

1  policy provides that, if there are interrelated wrongful acts, the date of coverage is

2  the date of the earliest wrongful act.  Lexington will argue that when the kidney-

3  related claim was consolidated with the eye-related claim in May 2006, the coverage

4  that was initially in place under the April 2001 through April 2002 Texas Farmers

5  policy evaporated because the alleged wrongful acts regarding the kidneys took

6  place during the 1999 and 2000 policy years.

7           Lexington's anticipated argument is legally and factually without merit for

8  two reasons.  First, Lexington ignores the fact that the reinsurance relationship here

9  was between Lexington and Ordway Indemnity; there was no contractual

10 relationship between Texas Farmers and Lexington.  Texas Farmers' contractual

11 relationship was only with its insured, Kaiser.  Thus, the only insurance policy for

12 which coverage is relevant for reinsurance purposes is the Ordway Indemnity

13 policy.  As noted above, the Kupukaa claim clearly was covered under the excess

14 liability policy.  Indeed, there is nothing in the Ordway Indemnity contract that

15 excludes or in any way eliminates coverage if coverage is unavailable for a given

16 loss under the Texas Farmers' primary level policy.  Rather, Ordway indemnity

17 agreed to indemnify Kaiser against ultimate net loss ***in excess*** of the "underlying

18 amounts."  And, with respect to "underlying amounts," there was no requirement

19 that the insured, Kaiser, even insure that underlying amount by way of a separate

20 insurance policy.  Kaiser had the option of satisfying the "underlying amount"

21 requirement of the excess policy with Ordway by way of self-insurance.  (Fact 7.)

22 Thus, whether there was coverage or no coverage under the Texas Farmers

23 Insurance policy is entirely irrelevant as to whether or not Lexington has an

24 obligation to pay pursuant to the reinsurance certificate.

25          Second, if anyone should be found to have acted unreasonably or in bad faith

26 with respect to positions taken in the Kupukaa claim, it is Lexington.  The only basis

27 of Lexington's position that is not obligated to pay under the reinsurance certificate

28 is the presence of the kidney-related claim in the Kupukaa arbitration proceeding.  It

-19-

1  is undisputed that Lexington was fully aware that the claim, at the recommendation
2  of attorney Hunt and concurrence of Kaiser, was added to the arbitration proceeding
3  in May 2006.   If Lexington had been acting reasonably and in good faith, it would
4  have immediately notified its reinsured, Ordway Indemnity, as well as Texas
5  Farmers, Kaiser, and Kaiser's defense counsel that the adding of the kidney-claim to
6  the arbitration proceeding presented coverage problems.  At that point, the parties
7  could have analyzed the issue and determined what was in the best interest of all
8  involved.  Lexington, however, did nothing.  Instead, it bided its time and did not
9  raise "coverage" issues until late November 2006, six months later, immediately
10  before the first mediation set for December 1, 2006.

11      The court should not condone this conduct by allowing Lexington to second-
12  guess everything that was done by the ground level participants in reaching a fair
13  resolution of the Kupukaa arbitration proceeding to protect Kaiser and Dr. Miller.
14  The "follow the settlements" doctrine precludes it as a matter of law.

15                                  **IV.**
16                           **CONCLUSION**

17      Under the "follow the settlements" doctrine, Lexington, as the reinsurer in this
18  matter, is bound by the settlement and coverage decisions reached by its reinsured,
19  Ordway Indemnity, in resolving the Kupukaa arbitration proceeding.  It cannot
20  second-guess those decisions now.  Texas Farmers' motion for summary judgment
21  should therefore be granted in its entirety, and judgment should be awarded to Texas
22  / / /
23  / / /
24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

1  Farmers pursuant to the terms of the Funding Agreement reached by Texas Farmers,

2  Lexington and Ordway, Limited in March 2007.

3
                                    SHEA STOKES ROBERTS & WAGNER
4

5
   Dated: February 22, 2008          By: */s/ Patrick M. Howe*
6                                          Patrick M. Howe
7                                          Attorney for Plaintiff and Counter-
                                           Defendant Texas Farmers Insurance
8                                          Company

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................1

II. FACTS .................................................................................................3

    A.    The Kaiser Insurance Structure.................................................3

    B.    Ordway Indemnity's Reinsurance With Lexington ...............................4

    C.    The Kupukaa Claim is Made ...................................................4

    D.    The Kupukaa Claim Enters the Binding Arbitration Process; the Anticipated Exposure Reaches the Ordway Limited Attachment Level......................................................................................5

    E.    The Kupukaas Allege a New Kidney-Related Claim; the Claim is Consolidated into the Pending Arbitration at the Recommendation of Defense Counsel and Approval of Kaiser and its Insurers, and with the Full Knowledge of Lexington ................6

    F.    Six Months Later, as the Defense Team Prepares for Mediation, Lexington Raises Coverage Issues For the First Time Based on the Presence of the Kidney-Related Claim ............................................9

    G.    The Kupukaa Arbitration Proceeding Settles After Two Mediations..........................................................................11

    H.    An Agreement on Funding is Reached .................................13

III. ARGUMENT......................................................................................14

    A.    As a Reinsurer, Lexington is Bound by Settlements and Coverage Decisions Reached by Its Reinsured ....................................14

    B.    The Lexington Reinsurance Certificate Contains an Express "Follow the Settlements" Clause...........................................16

    C.    Ordway Indemnity's Settlement of the Kupukaa Arbitration Proceeding Was Reasonable and in Good Faith; Lexington Cannot Prove to the Contrary .............................................17

    D.    Lexington's Anticipated Arguments Regarding Coverage Under

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the Texas Farmers Insurance Policy Are Irrelevant.............................18

IV. CONCLUSION ...................................................................................20

CV 06-08220 ODW (AJWx)

# <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

<u>CASES</u>

*Bellafonte Reins. Co. v. Aetna Cas. & Sur. Co*
    (2nd Cir. 1990) 903 F.2d 910 ...........................................................................15

*British Int'l Ins. Co. v. Seguros Law Republica, S.A.*
    (2nd Cir. 2003) 342 F.3d 78 .............................................................................15

*Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.*
    (2nd Cir. 1992) 979 F.2d 268 ....................................................................15, 17

*City of Renton v. Lexington Insurance Company,*
    2007 U.S. Dist. LEXIS 69959 (W.D.Wash. 2007) 2007 U.S. Dist.
    Lexis 69959 ...................................................................................................17

*Commercial Union Insurance Company v. Seven Provinces Insurance
    Company, Ltd.*
    (D. Mass. 1998) 9 F.Supp.2d 49 ......................................................2, 15, 16

*Excess & Cas. Reinsurance Ass'n v. Insurance Con'r Etc.*
    (9th Cir. 1981) 656 F.2d 491 .............................................................................1

*The North River Insurance Company v. Ace American Reinsurance Company*
    (2nd Cir. 2004) 361 F.3d 134 ..........................................................................15

*Zenith Insurance Company v. Cozen O-Connor*
    (2007) 148 Cal.App. 4th 998 .............................................................................1


<u>STATUTES</u>

Federal Rule of Civil Procedure 56 .........................................................................14